Cepheid is an acronym for Cepheid Molecular Systems, Inc.  Case number 171690, Mr. Rabinowitz, do you want five minutes for rebuttal? Yes, please, Your Honor. Okay. We'll see if we give it to you. Thank you. Okay. May it please the Court. The claims of the Persing patent are directed to novel materials and methods for detecting tuberculosis infection and detecting drug-resistant tuberculosis weeks or months earlier than could be accomplished in the prior act. This case presents the issue that this Court did not resolve in Enri Brekker 1 with respect to Claim 21 of Myriad's 441 patent, which was directed to detecting 10 particular mutations in the Brekker 1 gene sequence. But with respect to the primers themselves, there's really broad language in the Brekker 1 and 2 case that basically just says primers are not patent-eligible. I mean, it's that broad. How do we get around that if you want us to say, well, some primers are patent-eligible? So I would identify three points of distinction from the statement in Enri Brekker 1. And let me just enumerate them, and then I'll deal with them in some greater length. First, these primer claims are specific, not generic as in Enri Brekker 1. Secondly, because MTB has a circular chromosome, faithfully applying the principle stated in Enri Brekker 1 to the facts of this case produces a different result. And third, the import of the three-prime hydroxyl structural difference was not argued to or addressed by the Court in Enri Brekker 1. Well, it clearly wasn't addressed at the last point. I concede the Court didn't address it, but wasn't it argued in the briefing at least? No, Your Honor, it was not. And the district court heard when it suggested that it was. And I'd like to quote to you the portions that the district court focused on when it made what is really an erroneous factual finding that the distinction was argued. And I'll also show you that, in fact, the patent owner in Enri Brekker 1 made a factual concession that doomed the particular defense that we're relying on. Okay, what page are you on? So this is in the Lexis version, which the district court cited to star 12, which is in the facts section. So where do I find that in your actual appendix? So this is on page – the first statement is on page 8 of the brief, of the opening brief that's submitted to the Court. In the carry-on. Page 8 of your brief? Of your brief, or of the – Of the brief submitted in Enri Brekker 1. The district court cited to the appellant's brief in Enri Brekker 1 for the proposition that the issue had been argued to the panel in Enri Brekker 1. Okay. I would like to – Do you have a citation to the record that we can look at? To where the court cited to that. Yes, Your Honor. Okay. In appendix 23 to 24, beginning on line 28 of the appendix of the court's – district court's opinion on page 23, the district court states, Indeed, Roche's argument relating to this distinction was raised in an opening brief in Enri Brekker 1. And then the district court cites two portions of the appellant's opening brief. All right, and you say those citations by the district court are not correct? Well, the – let me identify what the appellant actually said in Enri Brekker 1. The appellant said in – at star 12, the appellant said, There are no short single strands of DNA with a free three-prime hydroxyl group that can serve as primers. And the appellant made – identified multiple features. Short, single strands, free three-prime hydroxyl group. And then in the second quotation, they argued the import of this. And this is at star page 65. And then said, Claims to them, the isolated fragments, only cover the use of the claimed – only cover use of the claimed material in PCR, an entirely separate man-made utility, as demonstrated below. In short, while a DNA fragment might be capable of being utilized by a scientist as a single primer, which is a fact we dispute, unless it's been changed to add a three-prime hydroxyl, a claim to a pair of primers functioning together for use in PCR does not claim an unpatentable DNA fragment alone, divorced from the pair's application in PCR. And so, as we pointed out in our brief, the appellant in Enri Brekker 1 relied on two arguments. One was single-strandedness, and the other is that a pair of primers appropriately chosen had a utility together, which a single DNA segment did not. Neither of those arguments relied on the chemical structural difference that we're relying on here, between an isolated segment of DNA and one that has been changed by chemically adding a hydroxyl group to three primers. What's been changed? You result in – you get a primer because of that change? Yes, Your Honor. Merely isolating a segment of DNA does not produce a primer. A mere isolated segment of DNA, you need to actually chemically add a three-prime hydroxyl. Right, because the three-prime hydroxyl on a regular strand only ends up at the end. If it's a linear strand, then it will have – as in humans, as in Brekker 1 – it will have a hydroxyl at the three-prime end of the chromosome. In a bacterium like MTB, which has a circular chromosome, the circle has no end, there is no three-prime hydroxyl at all. But certainly the segment that you've isolated does not, by virtue of its isolation, acquire a three-prime hydroxyl. So is that what you claim differentiates these primers, the three-prime hydroxyl, from what occurs in nature? From what may be isolated from nature, yes. And that was the issue that the Supreme Court addressed in the Myriad case. It said – it considered – it entertained the argument that in isolating, you make a chemical change. But it said, well, for these claims, they don't depend on any particular chemical change. They don't require – But the primers in Brekker 1, they also had a three-prime hydroxyl group. They had a three-prime hydroxyl group at the end of the chromosome, not at the position of the prime – well, not within the Brekker 1 gene. So they did have a three-prime hydroxyl group. It's just not – it's at a different location than what you have in this case. Yes, Your Honor. Well, how does that still make the primers in this case eligible for patenting? It seems to me you still have a problem that this is a naturally occurring substance. Your Honor, our argument is this – primers – the primers claimed here do not occur in nature. There is no DNA strand with the required sequence that has a three-prime hydroxyl on it. In order to create such a primer, you have to either synthesize it or isolate a piece of DNA and put the three-prime hydroxyl. And what is the benefit of doing that? If you isolate a strand of DNA that has a sequence but not the three-prime hydroxyl, it will hybridize. It will stick to the DNA in the right portion, but it cannot prime a DNA amplification reaction. It cannot function in the PCR methods, which require – actually, a pair of primers, but it certainly requires – these methods require a primer of a particular structure that is based on the discovery the inventors had made. But it is not a naturally occurring isolated segment of DNA, because if you simply isolate without chemically changing, then you end up with a DNA that will hybridize but will not be a primer. Okay, so even if we were to agree, reading – based on your reading of what was actually argued in the BRCA1 and BRCA2 cases, that this argument about the primers having a three-prime hydroxyl was not actually presented to the court, so we shouldn't say they impliedly decided it. The language that was used in BRCA1 and BRCA2 is about as broad as you can imagine. It is, Your Honor. Let me address that. And how do we get around that? The answer is McCutcheon. The Supreme Court addressed this issue in McCutcheon. And in McCutcheon, the – so there are a total of three sentences in the BRCA1 case, exactly three sentences that deal with this. In McCutcheon, the Supreme Court – Pretty deadly sentences for you. If they bind this panel, then it would be constrained in the decision it could reach here. Okay. I suggest they do not. Okay. For the reasons that were said in McCutcheon, because in McCutcheon, the Supreme Court had decided an issue in Buckley v. Vallejo, actually, the aggregate contribution minutes. It reached exactly the opposite conclusion in McCutcheon, and it said it was free to do so for the following reason. They said this case cannot be resolved by merely pointing to three sentences in Buckley that were written without the benefit of full briefing or argument. In other words, the parties in McCutcheon directed their focus to this particular issue, which had been stated clearly. The aggregate contribution limits had been upheld in Buckley v. Vallejo as incidental to the individual contribution limits and a means of avoiding evasion. The Supreme Court held it was not constrained by stare decisis because it had not considered the particular arguments being advanced in McCutcheon, which won in McCutcheon, because three sentences written without the benefit of briefing and argument were not enough to constrain the court. Maria, it's emphasized that genetic information encoded is not panoply. That's correct, Your Honor, and we embrace that. Now, it seems to me, just from what I can gather, that these primers are exactly that. You're still left with genetic information that's encoded. With respect, Your Honor, I disagree with that, and let me explain why. As the Supreme Court points out in... But the primers are not genetic information encoded? They have a sequence which actually... Yeah, and that's genetic encoded... That is part of the structure of the primer, but not all of it. But the nucleotide sequence itself is found in nature, right? That's correct. So if you look at the claims in Muriad... All genetic information encoded is found in nature. Your Honor, you can claim a piece of DNA for what it encodes, which happened in Muriad, or you can change it and use it as a tool, and claim it as a tool, which is what's happening in these primer claims. Okay, so now I think we're getting, at least in my view, the point here. What is it about these primers that are different than what we saw in BRCA1? So in BRCA1, firstly, they're specific. Unlike the claims in BRCA1 were any pair of primers that hybridizes to any part of the BRCA1 gene at all. So these are very specific. They must hybridize to one or more of the 11 identified signature nucleotides. But if the standard is all genetic code, and now you've taken us to just part of it, I mean, it seems to me you're still included in that more general group. No, Your Honor. I think specificity, which the underlying concern of these judicial exceptions is preemption, and this is very narrow and specific, coupled with the fact that it requires a physical change. The Supreme Court said in Muriad that cDNA is patent eligible because it does not occur like that in nature. Yes, but this is not cDNA. But the Supreme Court did that recognizing two things. Okay, well, that's fine, but this is not cDNA we have here. That's correct, Your Honor. cDNA is patent eligible if it has been altered in the structure of its sequence. We say these primers are patent eligible because they have been altered in the structure at the ends. They are claimed and used as tools that can accomplish something, in other words, priming a copying reaction. They are not being used for the informational content, which was the claim in Muriad. They must do two things simultaneously. Number one, they must have the correct sequence that allows them to hybridize. And it's not really the gene coding content because this happens whether it's a coding or a non-coding element of the DNA. And secondly, they must have this three-prime hydroxyl because otherwise they cannot perform the priming function. Okay, your time's about up. I'll give you back some time for rebuttal, but do you want to say something about the other claims first and the Mayo issue? Yes, Your Honor. So on the method claims, we would say they're patent eligible on two separate bases. First, if the court upholds that the primer claim is patent eligible, then under this court's decision in Association for Molecular Pathology, a method of using a patent-eligible material is itself patent eligible. But even if the primer claims are not all patent eligible, these particular methods of using them are for the reason that— How do we get around Arioso or the method claims? Your Honor, these method claims are directed to a specific improvement in PCR, which comprises the use of a primer with recited structure, which was—the understated evidence shows this was unprecedented to do in PCR. When you perform—so the process step, the amplification step, has been changed from what was conventional by— Are you saying these claim a new PCR process? It is a process—a process using such a primer is an advance in PCR. But the PCR process is the same. The general process for PCR is the same, but when you focus the claims on a particular way of performing PCR that gives you a completely new— But do these claims then have to rise and fall together? In other words, we have to agree with you that the primers are patent eligible? No, Your Honor, you do not. If the primer claims are patent eligible, then so are the method claims, but the reverse is not true. If the primer claims are not patent eligible, the method claims are separately patent eligible, because they represent an improvement in a PCR test which comprises integrating the inventor's discovery into a general PCR method in the same way that the Arrhenius equation was integrated into a general old method for curing rubber. But isn't that just—I mean, isn't that just Ariosa, though? I mean, they made a discovery about how you could detect fetal DNA in the bloodstream and extract it and amplify it and do sequencing to discover certain defined genetic conditions. You made the discovery that this particular sequence identifies this bacteria as tuberculosis and you then use PCR in a routine way to identify it as tuberculosis. No, Your Honor. If our claims said, as the claims in Ariosa said, performing PCR using any primer you like and detecting the presence of the signature nucleotides, which you can do by performing PCR and then doing a sequencing reaction or using a probe, that would be appending conventional methods stated at a high level of generality to the recitation of a natural phenomenon. But you're still just using one specific natural phenomenon to detect and identify a certain type of bacteria. There are many ways of detecting these particular signature nucleotides that are not embraced by these very specific claims. You can amplify using primers directed to other portions of the gene, in other words, ones that don't hit at a signature nucleotide and amplify a region including the signature nucleotide and then sequence it or use a probe. How do you get around the language in our cases and in the Supreme Court that say that there's a difference between just identifying something and providing for a more practical use? The answer is in cells direct. In cells direct, there was an old method of preserving hepatocytes, which included a single freeze-thaw step. The inventors discovered that hepatocytes could survive not only one, but two rounds of freezing and thawing, multiple rounds. And so they applied this. They integrated this discovery into a method by doing something which was perfectly obvious once you identified the multiple freeze-thaw viability. They did freezing and thawing twice. And that actually produced an improvement which solved problems in the prior arms. Here, the inventors discovered particular 11 specific signature nucleotides. And they didn't claim a method of amplifying and then comparing to detect. That would have been the equivalent of the step to claiming BRCA1. And they didn't claim general methods of amplifying, as was the case in Ariosa. They specified that you cannot do the amplification step in the way it was conventionally done in PCR. But you had to use a novel primer that they were able to design based on their discovery. Well, that sounds like to me you're basing that part of the argument on the notion that the primer itself is patent eligible. Let's assume it's not. No, Your Honor, it's not. Well, let's assume it's not because that's where I want to talk about Ariosa. I mean, I think you're running into the same problem on this point with the broad language in Ariosa that you are in BRCA1. I mean, Ariosa said when it starts with a natural phenomenon, like a gene sequence, and it ends with identifying that gene sequence, which is what you do to say this is tuberculosis, that that's not patent eligible. Not if you specify a particular improved way of detecting the natural phenomenon that the inventors have discovered. Well, I think we're getting a little bit circular here. Your Honor, may I just point out that the Supreme Court in Mayo has changed to emphasize that new ways of using an existing drug are patent eligible. Okay, but you're way past your time. So I'll give you three minutes for rebuttal. We'll allow you to go over. I'll try to even out the time. May I have my five minutes? No, three. We're way over. Thank you, Your Honor. May it please the court. To rely on Mayo, the patent here just tells the relevant audience, biologists, about the natural law that the inventors discovered, that these signature nucleotides can be used to identify MTV. Well, I want to start with the primers. Okay. All right, so if we conclude that the argument really wasn't made about the three-prime hydroxyl at the end of these primers, that that argument really wasn't made in BRCA1 and BRCA2, are we bound by the language in BRCA1 and BRCA2? You are, because first of all, Rocha's counsel tries to dismiss the holding of BRCA1, that the primers are not eligible in that case, as three offhand sentences citing the McCutcheon case. Those three sentences are the culmination of a pretty thorough analysis of the primers in the context of the Myriad case. But never was there any discussion of the three-prime hydroxyl at the end. Well, there was, and I have actual quotes from the brief. He missed a couple of those. No, I'm talking about in the opinion itself. In the opinion itself, there's not. But let me go through and talk about why it doesn't make a difference, because the three-prime hydroxyl exists on the BRCA primers just as it exists on the primers here. The three-prime hydroxyl has to exist on every primer that's ever existed, whether it's natural or whether it was made in the lab. And we said something a little bit different in BRCA, and that was, I guess, dicta or not essential to the holding. Am I correct on that? No. No, there's nothing that's inconsistent with what I just said in BRCA. In fact, when you look at BRCA's statement that says primers do not perform a significantly new function, that's equally true for the priming function here, because primers in nature perform the priming function. And, in fact, primers, as they've ever been used, every primer ever made performs the priming function, because every primer has to have a three-prime hydroxyl, which gets us to the Myriad analysis, because it's not enough. So for Claim 21 in BRCA, we said we expressed no view on primers residing in certain sequences. Correct. And remember, in BRCA for the method claims— So there was—we did recognize that there's something there that we're not addressing in BRCA. Correct. The preemption argument that Roche's counsel brought up. But remember, in BRCA, the claims are being analyzed in the abstract idea context of Alice, not in the natural phenomena, natural law context of Mayo. And as the court said in Ariosa, that when you're talking about a natural law, it doesn't matter whether you're talking about a broad natural law or a narrow natural law. It's a natural law, and it's ineligible regardless of its scope. And, in fact, when you're considering preemption— The question is, is there a marked difference from what occurs in nature? Correct. And so is there anything about these primers that is not different from what occurs in nature? There's nothing, and that's what I was getting to with the discussion of Myriad. Remember, in Myriad, the Supreme Court recognized that the isolated claims in front of it were different from that sequence in nature. They were different because the bonds were severed. And so they refer—the Supreme Court refers to those claims as a non-naturally occurring molecule. They're different than what occurs to nature. But the court doesn't stop there. It says, OK, let's look at the differences, and let's decide whether those differences are the result of an inventive concept. It's the language used in Alice. Myriad uses the language, they're not the result of invention. So the question that Roche's counsel needs to answer is whether these three-prime hydroxyls at the ends of these primers are invention. Are they an inventive concept? But did these particular primers occur in nature? They're a little different. Right. They're different. That's the point, right? The isolated—the sequence that's claimed as it exists in the MTB chromosome doesn't have a three-prime hydroxyl because it's surrounded by other nucleotides. Exactly. So you'd have to be all the way at the end of the strand to get to the hydroxyl. Well, there's no hydroxyl at all in the circular MTB chromosome. But in the BRCA case, the BRCA gene had no three-prime hydroxyl either, the gene that was at issue in the three-prime hydroxyl. There's a three-prime hydroxyl on the chromosome, but that's millions of miles. Right. And so isn't that a distinction between the BRCA case and this case? It's not a valid distinction. It's not a valid distinction because—well, their own experts said that whether you're talking about a linear chromosome or a circular chromosome, the process of making a primer is going to be the same. That's within the ordinary skill. All you have to know, as soon as you know— Well, that goes to obviousness, not to pathology. No, no, no. It goes to conventional methods. It goes to the primer, which is an essential part of PCR. Everybody who's ever done PCR needs to make a primer. And so making the primer is a conventional step as part of the conventional process of PCR. All you have to know is the sequence. So the natural law is the sequence. This sequence helps identify MTB. Once you've identified that to the relevant audience, to biologists, the rest is easy. The rest is just standard PCR. Their own expert admits it. The patent admits it. Primer manufacture is just conventional. They use standard processes. The amplification step using that primer is just a standard process. Well, that wasn't the basis for the BRCA decision. The basis for the BRCA decision was that there was no identification of anything about these primers that wasn't exactly the same as what occurs in nature. And here, you're conceding that these primers don't occur in nature. So I disagree that the court based its premise on it's exactly the same as it is in nature. It recognized the overarching concern with the primers in BRCA is the same as the overarching concern with the primers here. And that is the genetic sequence that you need to amplify. So the primer needs to mimic the complementary sequence that you're trying to amplify. That's the overriding concern. Now, this idea of the three-prime hydroxyl, if you want an indication of the relative importance between the importance of the sequence and the importance of the three-prime hydroxyl, all you have to do is look at the patent. There's not a single mention anywhere in the patent of a three-prime hydroxyl. It is an unremarkable feature of every primer that's ever existed. And so it doesn't even merit mentioning in the 723 patent. Does it make a difference? What if it did mention it? If it did mention it, it would mention it in the context of other than the sequence, this primer is identical to all the other primers that have ever been made in a lab. It's made out of DNA. It's going to have the three-prime hydroxyl on it because it needs to mimic primers that exist in nature. I can go to the method claims. It seems to me like you've already done it. In other words, you seem to be conflating Mayo and Myriad. We have two different types of analyses going on here. The underlying principle is the same. Mayo makes the two-step analysis explicit. Remember, Myriad recognizes that, yeah, there are going to be some differences between the claim and the natural corollary to the claim, the analog in nature. But then the court goes on and says, mimicking the language of Mayo, where it says, in that case, isolating DNA from its surrounding genetic material is not an act of invention. That's the inventive concept of step two of Mayo. And what we're saying is putting this three-prime hydroxyl at the end of a primer is not an act of invention. It's not an inventive concept because as soon as you tell biologists, here's the sequence you need to amplify, they're going to get the complementary sequence and they're going to put a three-prime hydroxyl on it because that's the only way primers will work and that's the way everybody knows primers are going to work. So it's just a conventional step that's taken in the claims. And so I don't think I'm conflating the two. I think the two are actually pretty close analyses, although I will admit that Myriad doesn't make the two-step analysis explicit. What if the claim is for concentrations that are above that, primers that are above that, what you find in nature? Let's say, like, two million times more than what you find in nature. Is that palatable? That could be. I don't know enough about PCR to know whether something like that would be routine to a person in the lab. But certainly the three-prime hydroxyl is routine. It's not just routine. It's necessary. And biologists recognize it is necessary. It's just part of the routine, part of PCR. But that's the kind of thing that might be eligible under step two of Mayo, which is, yeah, standard PCR is conventional, but this is a modification of PCR, like the modification to the lab technique in cells direct, where all of a sudden you're not doing it. What if someone created a triple-stranded DNA, but it had the same sequence? I'd say, off the top of my head, triple-stranded DNA doesn't exist in nature. That sounds to me more like cDNA than the kind of primers that are involved here. I think that sounds to me like it would pass muster under the Supreme Court's tests. Okay. So I'll go to the method claims. And there really is no real distinction here between the method claims in Areosa, the method claims in genetic technologies, and the method claims here. Roche takes the position that nobody has ever amplified this sequence of DNA with primers to detect MTB before. Well, the patent owner in Areosa said nobody had ever amplified SIF DNA with primers out of maternal blood before. The patentee in genetic technologies, nobody had ever used a primer to amplify non-coding sequences to detect coding sequences. The question is not whether anybody has ever done that before. The question is, first look at the claims. Are they directed to ineligible subject matter? Here the claims are directed to the correlation between these signature nucleotides and the presence of MTB. Just like Mayo correlation, genetic technologies, the correlation between coding and non-coding, the Cleveland Clinic case. I mean, I understand that. I find Areosa hard to get around, too. But the implications of this to me are really troubling. I mean, what's the difference between saying we have this naturally occurring piece of DNA that we can then use to do a specific test and predict a specific result, and we have this natural occurring product of nature that we have discovered will treat a certain condition? It would, I think— It's because there's no alteration of the natural product. There's nothing. It's either you take a pill or even something. I mean, the example I was thinking about was aloe. If somebody was the first person to discover, if you take an aloe plant and slice it open and put it on a burn, can they patent that? I think the analysis would have to go to the second step of Mayo, which is this is a routine conventional step to take aloe from—take something from a plant and rub it on your skin. I think that the Mayo case addresses that kind of concern, which is a new use of an existing— Isn't there a difference between just identifying something and then putting it to a nonconventional use? There is. There is a difference, and the method claims here are identifying the MTB, identifying the natural phenomenon, that if you see these nucleotides, then MTB exists. That's exactly the kind of claim that CellsDirect distinguished, which is CellsDirect used a natural law, but it used the natural law, used the insight gained from the natural law, in order to create something, in order to create a collection of cells that had improved viability. And so that's an example of integration. But the CellsDirect case itself pointed to aerosol, pointed to genetic technologies and said— It helps to create a new product in order for it to be patent eligible, or can it just be a new application of an existing product? It can be a new application, as long as that application is not conventional, is not—here, the application of their discovery is PCR. In the words of— Well, that's the way you want to describe it. You could describe it as the application of their product is a new way to identify tuberculosis. Well, and Ariosa would—you'd have a long line of patentees behind them saying that, because the Ariosa— I did. I think Ariosa has language that forecloses that argument. It's just that the scope of that is kind of breathtakingly broad. I totally understand the concern, but I— Can you tell me—can you give me an example of a diagnostic method based upon discovery of a gene sequence that is now patent eligible in any way you state it? If such a thing exists, I think it would be patent eligible under the second step of Mayo. And what would you have to put into it to get it eligible under the second step? You'd have to use something other than off-the-shelf PCR. But then it's not the gene sequence, it's the actual process itself that's making it. Well, and I think that's the gist of Mayo. So your answer really is there is no genetic testing patent that, if it's used in conventional methods, is patent eligible? I think that's the necessary implication of Mayo. Do you agree that if the primers—if we find the primers to be patent eligible, if we distinguish this case from BRCA1, and we found the primers to be patent eligible, that the method claims would necessarily be patent eligible? If you were to find the primers eligible, you'd have to go so far as to say that the creation of the primers, notwithstanding the statement in the patent that we're just using conventional processes to make the primers. If you're going to make that finding, I think you're right. I don't see how we could also say that the method claims are ineligible if you make that finding, but I just don't think the record and the law can support that finding. But if we find patentability under Step 1, then we don't go to Step 2. That's correct. If you find eligibility under Step 1, then the answer to Step 2 doesn't really matter. And that's normally where the PCR-type application falls into place in these cases? On the Step 1? On the Step 2. On Step 2, yes. I think that's right, that they have to show something other than just standard off-the-shelf PCR. Thank you. Okay, thank you. Your Honor, if I may briefly address just a couple of points. First, in the BRCA1 case, counsel for the patentee made a concession opposite to the one that counsel here has made. And this is pointed out twice, on pages 27 and 37 of the appellee's brief, where they cite to a finding of fact that district court made, which appears at page 1266 of the district court's opinion. 3x up third at 1266, where the district court said, utility depends on the fact that a DNA segment used as a primer is structurally and functionally the same as a native genomic DNA segment with the same sequence and length. That is an untrue fact. It was conceded to be true in the BRCA1 case. We have created a record that refutes that proposition, and counsel has properly conceded it. What's your response to your friend's argument that the patent doesn't even emphasize the 3' hydroxyl? It does, Your Honor, because it uses the word primer. And there is no need to tell a molecular biologist that a primer has a 3' hydroxyl anymore than you need to tell a carpenter that a nail has a sharp point at one end. So then why doesn't that make it just a conventional response to analyzing these things that occur in nature? It makes it structurally different from what occurs in nature, and the Supreme Court in Marriott said cDNA is patent eligible, even though it acknowledged that methods for making cDNA were well known in genetics at the time, and that the sequence of the cDNA is determined by the naturally occurring mRNA. It doesn't require an innovative method if it is structurally different. That's what the Supreme Court held in Marriott. And for the same reasons that cDNAs produced by conventional method with sequences determined by the mirror image natural sequence of mRNA were patent eligible because they were not found in nature, so these claimed primers are not found in nature and are likewise patent eligible. Primers found in nature are RNA, they're not DNA. They don't have a length of 14 to 15 nucleotides as these claimed primers have, and they're never single-stranded. That's undisputed in the record. They are different. And the fact that an untrue fact was conceded in an argument we rely on here was not made. In the BRCA1 case, not to bind this panel in the decision it reaches on this record. But the primer is genetic information encoded. Yes. And that is what's not patentable. But we're not trying to patent the genetic information. We're trying to patent the DNA. But your primers end up being that. No, Your Honor, it doesn't. If all the primer contains is genetic information, it will not function as a primer because it doesn't have a three-prime hydroxyl. The primer has been fashioned into a tool by taking a segment of DNA that cannot support priming and changing it chemically so that it can. And even though it's an addition of a single chemical group at a particular point, that's all that distinguishes naturally occurring penicillin, which cannot be patented because it's isolated from a fungus that occurs in nature, and ampicillin, where you've attached a single chemical group and created a non-naturally occurring synthetic penicillin with new properties, new broad-spectrum results, there's a vast array of pharmaceutical patents which depend on changing naturally occurring compounds by adding a single chemical group or perhaps more than one. This would, I mean, this is the Supreme Court in Mayo said the typical pharmaceutical patent for a new compound, even if you create it by the obvious step of adding a hydroxyl, is not patented and ineligible. And then to go to the point you raised, Judge Hughes. No, your time is up. Your time is up. I've already let you even go past your three minutes. Thank you, Your Honor. We have to stop at some point.